or argument not to exceed 15 minutes per side. Mr. Good for the appellant. May it please the court, I'd like to reserve four minutes for rebuttal. My name is Jonathan Good and I represent Donald Snyder in this appeal. We respectfully request that the court reverse the trial court's decision to grant summary judgment to Pierres. Viewing the facts in the light most favorable, a reasonable jury could return a verdict in favor of Mr. Snyder. This case involves an age discrimination claim. Mr. Snyder is claiming that he was subjected to a hostile work environment and that he was treated, he was disfavored when younger workers were favored. Mr. Snyder went to work at Pierres. He liked his job. In 2007 he worked on the dock and he got a new supervisor, John Bittinger. John Bittinger was in his twenties and from 2007 until when Mr. Snyder was laid off in January of 2010. Mr. Bittinger made daily comments to Mr. Snyder. Hey old man, you're too slow. By the way, if it was up to me, I would have never hired you. And he made these comments to Mr. Snyder four to five times a day, every single day. And according to Mr. Bittinger, he made those comments up until the day that Snyder left on layoff. Mr. Bittinger also did not appreciate that Pierres was sending him older temporary workers and Mr. Bittinger went and complained to his supervisor, Mr. Sillian. Hey, I don't appreciate you sending me these older temporary workers. They can't handle the freezer. The freezer is a harsh environment. Mr. Bittinger admits that he made these comments to Mr. Sillian. And this theme is echoed by the president of Pierres that the freezer is a harsh environment in Shelley Ross affidavits. You know, I realize you're talking about the hostile environment claim right now, but the fact that Pierres regularly accepted these older temporary workers that they hired Mr. Snyder when he was already within the protected range, doesn't that suggest that or indicate that Pierres is not that type of employer that has any kind of protection? I don't think so. When Mr. Bittinger is making daily comments that he did not appreciate the older temporary workers on the dock and that he's making verbal comments to Mr. Snyder and other older workers on his dock right in the face of these complaints, what's the record as to the action? Actions that Mr. Snyder and others took in terms of reporting this activity of the 20-year-old supervisor to upper management? Mr. Snyder complained to Mr. Sillian seven to eight times about Mr. Bittinger's derogatory comments and humiliating comments and saying hey, this is getting out of control. Mr. Snyder complained to Mr. Sillian seven to eight times and then Mr. Snyder started to feel that this was getting a little serious and he started to fear for his job. And then he was laid off and six months later when there were opportunities for Mr. Snyder to be recalled and he was seeing that he was being passed over in favor of younger workers, Mr. Snyder went into human resources and complained about I think there's age bias going on here. And he complained to human resources and he did file a grievance regarding the use of younger temporary workers. The two claims, the disparate treatment claim and the hostile work environment claim, really depend on two discrete sets of facts, correct? I think... I mean, Bittinger had absolutely nothing to do with who was laid off and who was recalled. Well, he influenced the decision makers is our point. Well, what's the specific evidence of that? Well, he directly went to Dave Sillian and he complained, I do not want younger temp workers on my dock. In a general way, there's some evidence that he might have said that, but there's not any evidence that he had anything to do with the decisions about who was laid off and who was recalled, right? Well, Mr. Bittinger did make assessments, he assessed his personal needs and he reassigned employees on his dock. Who was laid off, Mr. Bittinger denies that he played a role. Well, is your theory of this case that Mr. Bittinger is responsible for what happened in connection with the disparate treatment claim? I think he played a role in the disparate treatment of the workers assigned to him. That he influenced Shelly Roth, Gail Sullivan and Dave Sillian. And the proof you have of that is that some other unspecified time, you think that there's evidence that Mr. Bittinger said to Mr. Sillian that he didn't like having the older workers assigned to him? Well, and he said the freezer is a harsh environment and that line of thinking is also echoed by the president, Shelly Roth, saying the freezer is a harsh environment for older workers. Okay. So at some point those things were said to Mr. Sillian and therefore Mr. Bittinger must have influenced what happened in connection with the disparate treatment claim? I don't think you're going to get there. I mean, I expected you to agree fairly readily that the two are really not related to any great degree. I think they're all in the nexus. All these comments, all these factors, all these players are interrelated and they play a role between Mr. Bittinger, Ms. Sullivan and Shelly Roth. So based upon all those comments, we believe that there was an objectively and subjectively adverse hostile work environment. In addition, Mr. Snyder was disparately treated when compared to similarly situated younger workers. Younger workers were favored while Mr. Snyder was disfavored. There's two glaring examples of this. Piers recalled three union workers for seasonal work in the summer of 2010. That was Pogoleski, Mr. Crowder and Mr. Cruz. Piers anticipated that this work would go on for at least eight weeks, probably longer. About six weeks into this tenure, Mr. Pogoleski dropped a large pallet of product. They requested him to take a drug test and he refused. And so they gave him the option to resign. Piers knew that Mr. Snyder was next in line to be recalled for this seasonal part-time work, which they had previously given to other... Wait just a minute. I want to ask you about that. There is some confusion in the record about the description of these recalls as being temporary. But for these union workers, there's no indication that they were the same kind of temporary employees as these other employees who were sent over by some sort of temporary employment service who were paid less and didn't get benefits. I mean, when a union worker who had been employed full-time was recalled, he didn't suddenly become a part-time employee without benefits and with lesser pay, did he? Piers will say that's exactly right. I don't see how it could really be otherwise. But if you think there's some evidence in the record that supports the position that they were somehow called back at a reduced salary and with no benefits, I'd like to know about it. But it seems to me that although the record's a little confusing, we have to understand that temporary here is being used in two different senses. Well, okay. I think in the record when Cruz Roberto, jumping ahead to November, when Roberto Cruz was recalled in November 2010, he was recalled to a temporary part-time position and his rate was reduced from $17 down to $16. But he still had his benefits, didn't he? But he still got the benefits, yes. So, I mean, so the answer is there's not anything to support the idea that the recalled union workers were somehow in the same category as these folks sent over by the employment agency. I don't see, I don't have any evidence where the union workers were recalled at $9, $10, $11 an hour without benefits. Okay, and related to that, I know you used the example of the recall of the worker in 2010, and you've argued this as evidence of disparate treatment. But even though Piers had on occasion recalled regular employees before, as opposed to these agency attempts, there was no policy that Piers had, and it was not a part of the collective bargaining agreement, that Piers would have to call the regular laid-off employees back in a temporary capacity. That was not a policy, correct? No, it wasn't a policy. Okay, and so the fact that Piers did not have such a policy ensconced in their collective bargaining agreement, Piers could, in fact, use agency attempts if it chose to, to reduce costs or whatever, correct? They could. It wasn't a policy, but it was a business practice of theirs for many years, to when there were union employees on layoff, that they would call those union employees back first prior to bringing in temps. And the point of the summer of 2010 incident with POGO is that when Snyder is next in line to be recalled, all of a sudden Piers changes its business practice and calls an attempt under the mantra that we need to save money. Well, if that mantra held true... I think you've answered the question, and if you have, you'll have your rebuttal time. Thank you. May it please the Court. Michael Chesney for the Appellee Piers French Ice Cream Company. Good morning, Your Honors. This case arose after Piers, which is a small family-owned ice cream company in Cleveland, was forced to undertake these employee layoffs. And these employee layoffs were occasioned by the fact that the company had lost major customers and was facing intense and increasing competition from large multinational companies. Now, the layoff of these employees was accomplished in strict seniority order, and there was no dispute about the layoffs. It was done per the union contract. The recalls that took place were also done in strict seniority order. The only discretion that Piers could exercise relative to these recall decisions was to exercise its business judgment to determine when it had enough work to justify the recall of one of these union employees. And this is what Mr. Snyder has challenged in this case, is the company's judgments relative to when it could make a financial commitment based upon projections of work levels to bring back one of these union employees. And it's important background in this case to understand that prior to the layoffs and recalls in this case, the company had bargained very hard with its union for the right to use these temporary workers. And ultimately, Mr. Snyder's union had agreed to these contract provisions to give the company the staffing flexibility that it needed to survive through these very tough times. As it was pointed out during Mr. Good's argument, the recall of a union employee is a very expensive undertaking for the company. They have a much higher rate of pay than a temporary worker. They have a very, very rich benefit package that includes contributions to the Teamster Central States Pension Fund, contributions to a dairy union worker's 401k fund, full health and welfare benefits. And these are not paid to temporary workers. So based upon all these circumstances, based upon the competition the company was facing, the right to use temporary workers, and the cost of calling back a union employee, what the company determined was it would call back union employees when its projections supported that it would be a long-term recall, and a recall that might evolve into a permanent recall. And when the company's projections were such that this would be a temporary assignment, a finite assignment, the company exercised its contractual right to utilize temporary workers. And one of the points I think your counsel opposite makes is that Snyder made a decision apparently that there was a need for, I guess, a long-term recall of three individuals. And they called back those three. Mr. Snyder was four. One of those full-time callbacks flattened out and was fired. And so there was a need for three. All of a sudden you've only got two. He's next. But Snyder doesn't call him. They then go back and call temporaries. And I think he's saying that this is evidence that there was some age bias at play. And I'd like you to respond to that. Absolutely, Your Honor. That individual, Mr. Pogorzelski, was recalled, I believe, in April of 2010. It was late July of 2010 when ultimately he lost his position, resigned, terminated, whatever we want to call it. By that point in time, the seasonal uptick in work was declining, and the company had realized that the projections relative to the amount of work that it was going to have going forward would not support a permanent recall. There was an individual, Alfonso Friedman, a temporary worker who was brought in. In fact, that assignment lasted only six weeks. So to have brought Mr. Snyder back and to reinstitute all those benefits and the higher rate of pay when the company knew at that point three months later that it was going to be temporary, the company exercised its right to use temporary workers there. Excuse me. What time of year did you say that was? The initial recall, Your Honor, was in the spring of 2010. I believe it was April of 2010, and then he lost his position in late July of 2010. All right. Thank you. You're welcome. I'll briefly address the arguments relative to Mr. Bittinger's being involved in the decision-making process. There was absolutely no evidence offered at the trial court level that he was involved. I mean, this would essentially involve a theory that this low-level night manager in the warehouse was consulting at the highest levels of the company with the president of the company as to recalls, and the company submitted uncontradicted sworn testimony from Ms. Roth, who was the president and owner of the company, and Mr. Bittinger himself that he was not a decision-maker relative to those recalls. Addressing briefly the indirect method of proving his claim for disparate treatment here, the district court properly found that he could not prove the fourth element of his claim, that is that he was either treated less favorably than substantially younger, similarly situated employees, or that he was replaced by an employee. And relative to the treated less favorably prong of this element, there are two very clear reasons why the three union employees above him were not similarly situated. They occupied higher spots on the seniority list, so the company was constrained to recall them first. And secondly, they were recalled in circumstances where the company had these projections that it would have enough work for a long-term, potentially permanent recall. And there's no evidence of any later circumstances where the company had such amounts of work and refused to recall Mr. Snyder. Turning to the pretext element, which was a separate basis for the dismissal of the disparate impact claim, I'm sorry, the disparate treatment claim, the evidence here is even stronger. Pierre's financial circumstances at this point in time were undisputed. In 2010, the company sold 5 million fewer cases of ice cream than it had sold in 2009. It's also undisputed that the company had fought very hard and had obtained the right to use temporary workers in these circumstances just before these layoffs and recalls. And Mr. Snyder was a part of the bargaining team that negotiated that contract. And while Mr. Snyder has sought to portray temporary workers as some sort of source of younger workers, the evidence in the case also showed that the company had no influence over the identities or the ages that the staffing companies would send to them of these employees. I think perhaps the most significant piece of evidence relative to the disparate treatment claim is this. There were only three union workers in this case who were not recalled by Pierre's. Mr. Snyder, an individual by the name of Charles Hone, and an individual by the name of Stephen Bibb. And Mr. Hone and Mr. Bibb are both under 40 years of age. So what you have is a situation where two out of the three workers who were not recalled by the company are outside the protected age group. And this doesn't speak in any meaningful way to the company seeking to rid itself of older workers. In fact, the company also introduced evidence that its workforce became older after the layoffs and recalls. After these layoffs and recalls, 80% of the company's workforce was over 40 years of age, and 40% of the company, I should say nearly 80%, nearly 40% of the company's workforce was over 50 years of age, which are really extraordinary numbers. I'd like to briefly address Mr. Snyder's age harassment claim, which was based upon the alleged age-related comments of Mr. Bittinger, who was the night supervisor in the warehouse. And there are several separate bases to affirm the district court's dismissal of this claim as well. First of all, with respect to the notion of whether the comments and name-calling were based upon age animus, Mr. Snyder testified in his deposition that Mr. Bittinger actually treated younger workers just as or more harshly. He testified that Mr. Bittinger had abused and harassed, and those were his words, those were Mr. Snyder's words, abused and harassed two younger employees under the age of 40 named Charles Hone and Eric Cantale. And in fact, it was Mr. Snyder's testimony that Mr. Bittinger rode Mr. Cantale so hard that he was forced to quit the company. I thought that from the record, Mr. Snyder said that looking at the quantum of comments and the environment that the comments of Mr. Bittinger created a hostile work environment. And so my question to you is, even though there may have been these pervasive comments or there may have been all of this shop talk and it may have been characterized as offensive, couldn't those comments about not wanting to have older workers or some of those harassing comments, couldn't they have been sufficient enough to create an objectively hostile environment based on age? I think given the totality of the circumstances in this case, Your Honor, we would argue no, that they did not. And I think there's been some degree of combining or conflating testimony of Mr. Snyder and another employee who testified in this case, Mr. Ashcraft. Mr. Snyder never testified that he was subjected to daily age comments, and I won't get into arguing how many times the term old man or anything like that was used, but he didn't say that it was to that extent. Mr. Snyder says that he reported this to upper management, brought it to their attention. Is there anything in the record that the company ever did anything to counsel Mr. Bittinger about his comments in the workplace? I'm sorry. When Mr. Snyder finally made a formal complaint, and he did so seven months after he'd been placed on layoff, the company did investigate, and the company did counsel Mr. Bittinger with respect to his actions. Getting back to your question relative to whether this created an objectively hostile work environment, there are numerous reasons why I'd argue there weren't. Many courts have recognized that this type of name-calling, this back-and-forth name-calling, in and of itself is not sufficiently severe, and it should be particularly clear in a case like this where Mr. Snyder was never once disciplined, was never once counseled. There was not a single adverse action that Mr. Bittinger took against him, and there was evidence in the record that he did discipline and he did counsel younger workers. There was no touching. There was nothing physical in this case. It was just back-and-forth name-calling. And we've referenced in our brief that Mr. Snyder readily admits that he was a frequent participant in this back-and-forth name-calling, and he was never disciplined for this. He called his co-workers and even Mr. Bittinger all manner of inappropriate names. And I apologize, but he would call them names such as Fat Chick, Pillsbury Doughboy, and Beach Whale. These are names that he's calling his supervisor and receiving no discipline. This was the atmosphere, right or wrong, that existed on the night shift. Employees engaged in a lot of shop talk, a lot of back-and-forth name-calling. I think the fact that it wasn't severe and pervasive is further emphasized by the fact that Mr. Snyder was a union officer. He was the steward on his shift, and he was a prolific grievance filer in his own right and on behalf of other employees, and the record showed that over the course of his employment, he had filed nine separate grievances on his own behalf, which was a record number for the company. And not once did he grieve this alleged harassment that was taking place, and there were specific provisions in the contract that prohibited discrimination and harassment. And he knew of those provisions. He testified to that, and he obviously knew that he could avail himself of a grievance. Does that go more to the subjective aspect of the prong or more to the objective aspect of the prong? We're talking about hostility. That's a good question. I think it arguably goes to both of them, depending on how you view it. I had thought about it more as an indication of the extent to which it had an effect on his job or his terms and conditions of employment subjectively, but you think it has something to do with the objective element? Well, I think that's a great point. Certainly given the context of who he was in the union office that he held and his failure to pursue this through grievance when he'd shown no shyness in the past for doing it, it probably does speak more clearly to the subjective element. But I think when you consider the totality of the circumstances, that's just one additional element that objectively shows that it was not a sufficiently severe atmosphere. The one last piece relative to that element that I'd point out, and this was also very significant, he testified in his deposition that he was always able to do his job, and specifically that Mr. Bittinger's alleged name-calling never impacted his ability to do his job. One point I'd like to clear up. I think opposing counsel may have said that Shelley Roth said that a freezer is a harsh environment for older workers, and there was absolutely no such evidence in this record. She testified that the freezer that these employees worked in was a harsh environment, and I don't think anybody disputes this, but she absolutely never linked this to older workers or made any statement to that effect. So I would like to clarify that point. Your Honors, unless there are any additional questions, I'll conclude by stating that it's our belief that the district court had several separate and proper bases for the dismissal of both the disparate treatment claim as well as the age harassment claim, and we would respectfully request this court affirm that decision. Thank you. Mr. Good? The comments are all corroborated. Bittinger himself says he did it daily. Gail Sullivan's investigation corroborated that she talked to Bittinger and he admitted that he made all these comments and that he went to Cillian and asked that older temporary workers not be sent to his dock. I think what we're talking about is can peers use legitimate business judgment by using temps, or is there more to it than that? In the cases where they find the use of temporary workers, they are not similarly situated and you can't compare the two. In those cases, they didn't have the plethora of daily comments of age-based bias, of hostility, of severe and pervasive comments on a daily basis, from the frontline supervisor all the way up to the director of operations here. So in this instance, we have a little bit. The director of operations didn't, what did he do that reflects age bias? Well, he was Dave Cillian. I understand that, but do you think, I mean, what about his conduct reflects age bias? Well, they didn't do anything to correct Mr. Bittinger's comment. Is Mr. Cillian older than Mr. Snyder? Don't I remember that? Yes, he is. Okay. So in this situation, we have more evidence of age-biased comments, and we submit that a reasonable jury could make inferences of age discrimination here and disregard Pierre's legitimate business reasons that they have proffered here. Moreover, Pierre's legitimate business reasons that they proffered have shifted over time, and it seems to shift when Mr. Snyder is next in line. In July 2010, when Mr. Snyder was next in line, they shifted and they used temporary workers. Six weeks later, in November, when Roberto Cruz was laid off and rehired for part-time temporary work, you would think that if things were so dire at Pierre's that they would use that opportunity to bring back in a temporary worker and save from paying all the pension obligations and benefits. But they didn't. They recalled Mr. Cruz immediately to that temporary job. So Pierre's legitimate reasons shift over time, and that's pretext for underlying age discrimination. If there are no further questions, we'll leave it to your discretion. We appreciate the argument both of you have given, and we'll consider the case carefully. Thank you.